Life Assurance Society of the United States, et al., number 08-2554. Is it Mr. McDonough? Yes, your honor. I hope I came semi-close. And is it Ms. Saakash? Saakash, okay. I once had a girlfriend with the same spelling, but we pronounce it Saakash. That was back in high school. It was a long time ago. May it please the court, I am Stephen McDonough of Archer & Griner, representing Stephanie Cantor on behalf of the estate of her mother, Roberta Schwartz. We are the plaintiff below. With the court's permission, I would respectfully ask to reserve three minutes for rebuttal. Granted. As your honors know, this case stems initially from the murder of Roberta Schwartz by her husband. And therefore, the case came under the New Jersey Slayers Act. And eventually, an important decision was rendered in September of 2001 by the state court in the Wasserman decision. Let me just start off with just a naive question, I guess. This is a six-year statute of limitations. Correct. And in 2001, you get a decision regardless when this statute was told until. And you didn't bring it for, what, the first two years because why? The first two years were spent primarily trying to recover assets. Recover assets. And you ended up getting, what, $390,000? Approximately, yes. And the next two years, I guess, there was squabbling within the family as to what they wanted to do? There were various, unfortunately, various problems and disputes within the estate itself. I can provide as much detail as your Honor wishes. No, just general. Yes. And you still had two years after that. Why wait so long? Well, there are a couple reasons for that, your Honor. First of all, the estate disputes were not resolved until early 2007. So I can certainly confirm that for your Honor. Beyond that, first of all, of course, we believed that the statute would run in the fall of 2007, six years after the decision in the fall of 2001, September specifically. In addition, we felt that notice of the Slayer Act claim had been given to Equitable multiple times, of course, over two years. And therefore, the claim had been perfected in the sense of giving the notice required by the Slayers Act. Certainly, I would acknowledge – Can I say something? Yes, your Honor. Once you gave the notice and Wasserman came down in 2001, did anyone send a copy of Wasserman to Equitable? The Wasserman opinion, your Honor? Is that what you're speaking of? Yes. As I stand here, to my knowledge, I don't believe that occurred. Certainly, by that point in 1997 and 1999, notice of the Slayers Act claim had occurred. I can tell you that there were many, many efforts to recover on the judgments rendered in the state court over several years from many parties. And I can also tell you that one of those parties, I believe, was also Equitable on other accounts. So I can't tell you specifically that they received the opinion, but I can tell you that many collection efforts occurred as to many parties, including the murderer himself and his family and estate and other parties who had held accounts for the killer. But to answer your Honor's questions, no, as I stand here, I don't recall that they were provided with the opinion. Do you know when they learned of the opinion? Other than, of course, when this matter was instituted, I don't know. And the opinion itself deserves special consideration, because I think that's the heart of this case. I want to make clear that the opinion said five important things for the first time. So for the first time in September of 2001, five important things were pronounced. First, for the first time under New Jersey law, the estate of the killed spouse had a right to equitable distribution in the marriage. In addition, that equitable distribution would involve assets held by the killing spouse himself. And beyond that, the equitable distribution would also involve retirement assets, such as this one held by the killing spouse. So those three matters of law were very important and pronounced for the first time in the decision. Beyond that, the trial court in the September 2001 decision rendered two factual matters which are very important. First, it set the amount for equitable distribution. Until that decision in September 2001, we did not know if there will be equitable distribution and what the amount would be. So in turn, we did not know that we would have any claims and what the amount of those claims would be until the state court judge in 2001 rendered his decision. So that opinion rendered a true mix of legal and factual findings, which formed the basis for what we ultimately sought from equitable. And what I mean by contrast is if the trial court had said, okay, I'll allow equitable distribution, but given the facts of the case, I'll make it a modest amount that the deceased spouse's estate will receive, there would probably be no claim against equitable. It was only when that amount was fixed that it became apparent that there was a claim against equitable. I think that's crucial, and I want to make sure I'm clear with that with your honors. But at the same time, there was notice sent to equitable to hold these assets because the estate was making a claim. In fact, not one notice, but two notices. Actually, four, in the sense that in 1997, an order and letter were sent, and then in 1999, an order and letter were sent three ways, regular mail, fax, and certified mail. And Mr. McNair? Yes, Your Honor. And Mr. McNair, was there any response from equitable to these notices? Yes, they paid the money to the killer. Well, any response to the sender of the notices? No, and I didn't mean to be flip about the response, Your Honor, but I don't know of any response equitable gave, but it's very clear that within just a few months of the second round of notices, they paid the money to the killer. But at the same time, there was a sufficient determination that there was a right to these assets held by equitable to make a claim to equitable, not to pay them to the husband by the estate. I'm not sure I understand, Your Honor. Certainly, the notices in 1997 and 1999 were equitable. You are on notice that there may be Slayer's Act claims here. Right, exactly. And there are restraints on the killer and his assets, and you hold those assets, and you are hereby on notice. So the notice was from the estate, right? Yes, the estate's counsel. Okay, the estate at that time had a sufficient understanding that there was, if not a clear claim, a claim that was worth sending out the notice on. I would agree with a claim worth sending out the notices. I would point out, though, again, that until the September 2001 opinion, the estate didn't know if there would be equitable distribution or what the amounts would be. Until an award was made by the state trial court in September 2001, the estate of the deceased spouse did not know what she would be entitled to, what amount she would be entitled to. If it were a modest amount, there would be no claim against equitable. Only because of the size of the amount and, in turn, the inability to recover from the readily available sources did it become obvious that the claim against equitable had to be pursued. If it were a modest amount and the amounts could be collected quickly, then it wouldn't matter. And the trial judge – Yes, Your Honor. Didn't I read that you made or the estate made notice to other entities about the implications of the Slayers Act, and other entities did make payment, is that right? The other entities honored the notices. Only equitable is the one who received the notices and paid the money to the killer despite the notices. So why, because of the fact that you'd already sent out this notice and you had other entities making payment, why didn't the estate at that point in time go ahead and file a suit? The payments by the other entities, I believe, came later on, Your Honor, after the equitable distribution rights arose. But did they come at what time? I mean, did they come more than six years later? Generally from 2001 to 2003, as best I can recall. Okay. So then, as Judge Fisher has asked, why didn't the estate at that time go after equitable to get those payments as they had been receiving payments from other entities? Knowing the way Judge Simandl ruled, the estate should have, admittedly, but the estate believed it had six years, wanted to exhaust all of its remedies. The fact that you believe you have a certain amount of time does not stop the statute of limitations running if, in fact, you don't have that amount of time. I understand. I'm simply responding as to why the estate may have felt it could wait until the fall of 2007. As opposed to you telling the estate. Or under any scenario, sure. But the estate said, okay, in September of 2001, we now learn that the estate has the right to equitable distribution, and that includes assets in the killer's name, and it includes assets in his retirement accounts, which always get special consideration, and we now know the amount calculated by the judge in the September 2001 opinion, and we now know because of that amount, we're going to make collection efforts, but eventually we may have to go after the equitable account, and the estate did have to go after it. But I certainly acknowledge that, you know, there was an adequate time to file the claim. There was. No two ways about that. But because the belief of the estate was it had six years, that was one of the factors in why it took care of other business in the meantime. It felt that it was protected by the six-year statute of limitations, that statute of limitations being triggered by the legal and factual information it only learned in September of 2001, and, of course, by the other steps it took along the way. But I think that combination of factual and legal information in the September 2001 opinion may have been respectfully what got off course below. There were facts that stemmed from that opinion that were necessary for the estate to know before it knew it had a claim against equitable. In addition, I'm sure your honors have picked up on the fact that this case is infused with public policy issues. We have the Slayers Act. What happened here is exactly what's not supposed to happen under the Slayers Act. Exactly. A few months after equitable was given notice of this Slayers Act claim, it paid the full amount to the killer. There's nothing in the record to suggest that if the case goes forward, hopefully we'll learn what, if anything, equitable did. Did it look into the matter at all? But there's two lessons, and one cuts one way and one the other way. Yes, normally in their position, rule 101 is that you file an interpleader action. Yes. On your behalf, rule 101 is that you file a complaint as soon as you possibly can. Well, I'm not sure I agree with that respectfully, Your Honor, because I would say the rule is you file the complaint as reasonably soon as you can within the statute of limitations. That gets us back to the heart of the case. But you wouldn't be here today had you not filed or had you filed just a few months earlier. That's correct. If the estate even realized there was a risk that the district court below would find an earlier statute of limitations, it would have and, frankly, could have filed earlier. I mean, at the end of the day here, you're what, only about a month, a month and a half late? It's a matter of weeks, yes. According to the court. And that's because the estate, and again that will be the issue for Your Honors, but the estate came to the conclusion it had six years, it consulted with counsel, and I see that the red light is on there. That's all right. And concluded that it had the six years. And while the estate had its own issues and disputes to resolve, and while the estate had to pursue other remedies, it operated on the belief with its counsel that it had the six years, and the filing was made a month, six weeks before that. But you also knew at the time that you were running right up against it and that there might be an argument against you. I mean, I guess you would think that one would at least file a prophylactic claim to preserve your ground. But, again, that's why we're here. There is that argument. And, again, perhaps we relied too heavily on it, but we thought that given the nature of this and the Slayer's Act policies that a court would not find that it would bar us from trying to recover against equitable and would instead let the killer get away with taking $90,000 despite the notices and orders and all those events. All right. Thank you very much. Thank you. Ms. Saakash. May it please the Court, I'm Catherine Saakash, and I represent the Equitable Life Insurance Society of the United States, AXA Equitable Financial Corp. Let me ask you a question at the outset. You can't sue, can you, as a plaintiff, until you have a cause of action. That's correct, Your Honor. And to have a cause of action, you need to have the elements of that action met in your belief. Is that correct? That's correct. If the elements here are, one, that you need to have notice to the insurance company, two, a payment to a party, in this case Schwartz, and three, a property right of the victim's estate, how was it that you had any property right of this victim's estate until the Wasserman decision came down in September of 2001? Well, let me clarify one thing that I think is helpful. The Wasserman decision did not make an equitable distribution. No equitable distribution was possible. But the estate, the replicant representing the estate, had no property right until September of 2001, did she? No. That is incorrect, Your Honor. Her property right arose as of the date of her mother's death. It's at that time. But how did she have a property right before that time if no court had ruled in Cantor's favor? Well, the court recognized her right in the ruling, but the right existed prior to the ruling. It was a pretty novel right. Has there been any case before that? There had been no case before that. Well, then, if they had brought that action, let's say in 2000, wouldn't they have been kicked out of court on a motion to dismiss? No more so than they would have been in the underlying Wasserman decision. When they presented that novel claim in the Wasserman court, the same argument could be made. You would have been kicked out. There's no reason why they couldn't have made that same novel claim in the case against Equitable. It was the same case. They were pursuing a Slayers Act claim against the estate, I'm sorry, against Dr. Schwartz, and they were pursuing a Slayers Act claim against Equitable. But if an essential element of the state's cause of action is that they have a right to say, okay, we have a right to that, they can now claim we have a right to that property, and they had no ability to make that statement until the Wasserman decision came out, and there was no prior case law, how in the world do you argue that the elements of this cause of action existed prior to September of 2001? Because the estate should have and could have very easily brought the same claim and made the exact same novel argument it made in Wasserman, which had not been recognized previously, in that Slayers Act claim and the Slayers Act claim it brings now. In Wasserman it was saying to the court, you can award us more money on our Slayers Act claim by applying principles of equitable distribution. We have a right to those funds. That right existed at the moment of her death. Perhaps no court has recognized it so far, but under the Slayers Act it exists, and the trial court agreed with them, and the Wasserman court agreed with them and said, you're right, that right exists, and that right existed as of the date of her death. That's when the valuation occurred. But the first time that they, and that's why you have tolling, the first time they knew that that right existed is when the court told them. Well, obviously not. No, the first time they knew that the court, for sure that the court would uphold their right is when Wasserman was decided, but not the first time that they had a right to make that claim. They made that claim, obviously, in 1997. In 1997 they made the claim. In 1997 they got their first ex parte order, which did not specifically mention the Slayers Act, and they forwarded that ex parte order to Equitable. That was the first notice. It specifically said it was only good until further order of the court, and there was a hearing set for a full hearing. The order was promptly vacated. Notice of that was provided to Equitable. Two years later they got another ex parte order. Again, that order was promptly vacated, and then Equitable was presented with a demand from the contract holder to be paid. Let's play out the thinking that Judge Roth just said. Let's say they had a cause of action in 1999 when they gave the notice, or 97, 99, when the actual money was paid out in December of 1999 by Equitable, the $93,000 to Schwartz. Doesn't tolling exist until at some point in the future? Tolling would exist until they learned of their claim, if they were unaware of the distribution. But as the trial court correctly found below, they hired a lawyer. You're saying that they learned of the claim when Bishop purportedly came across it in July of 2001? Well, it would have been at some point prior to July of 2001 when she was conducting her discovery and preparing her report, but at the very latest when she testified at trial as to the date of the assets as of three dates. And keep in mind, the trial, the bench trial that was referred to was a trial specifically to determine the value of the assets held in Dr. Schwartz's name alone and to determine what those assets were and whether they could be included in the Slayers Act claim. So she valued those assets, which included his annuity plan, at the date of the marriage, at the date of the death, and then the present value. What did Bishop actually say she found in July of 2001? We only have the Wasserman opinion to go by, Your Honor, and so it's not clear what her actual testimony was other than what the trial court reported it to be, and that's what he said it was. But she testified as to the value as of those three dates. She testified as to the value of distributions that were made by Dr. Schwartz to assets. She testified as to the amount of money that had been dissipated from the marital estate when specifically the opinion said that included the retirement funds, and therefore she came up with a value of what the estate should have been and what the actual value was. And it's based upon that that the underlying court in Wasserman then made an award under the Slayers Act. But there's no reason why Equitable could not have been joined, or perhaps even under New Jersey's Joiners Rule, should not have been joined at some point in that action as opposed to now having two separate actions over the same set of facts as to what the entitlement would be to any marital assets. When you look at, and I'm trying to find the right analogy here in cases, but perhaps the right analogy might be back pay cases, the statute of limitations accrues when the terminated employee wins a right to reinstatement in those cases. Why isn't this just like that? It's not just like that because there's no requirement that they ever proceeded against Dr. Schwartz. Had there been no Wasserman opinion, they could still have brought their claim against Equitable. It could still have said, you violated the Slayers Act because we gave you notice. We have an interest in this asset, and our interest is set forth in this fashion. And then that court could have determined whether they did or did not have an interest. And then it would be known as the Cantor ruling instead of the Wasserman ruling. Right, but there was no requirement, as it would be in the back pay case, that they wait for that ruling. They didn't have to wait for it. Ms. Sketich, taking a look at the annuity contract that's Exhibit A to the complaint, and particularly page 22 of Section 503, it talks about assignments and non-transferability. And it appears to me that the language here supports the claim of Cantor because under this annuity, no amount payable under the contract may be assigned or encumbered by the payee, and to the extent permitted by law, no such amount will in any way be subject to any claim against such payee. So didn't the change of law have to occur before the estate could recover? Because otherwise, the only individual who can recover under this contract is the named participant, Steven Schwartz. Did anybody look at that in the underlying case? I don't believe anyone looked at that in the underlying case. You better speak up just a touch. In Wasserman, the underlying court basically said it overrode what was in the contract. Roberta Schwartz did not have any interest in her husband's retirement plan. She had waived any beneficiary rights. She was not a beneficiary, and had she died of natural causes, her estate would never have been able to receive anything from that annuity. The contract language of the annuity is clear. However, under family law principles, even if this was under what the Wasserman court applied to the Slayers Act, you can look beyond that and give an interest in an annuity to a wife in the case of a divorce. And that law existed well before the Wasserman opinion. The Wasserman opinion just engrafted that. Why wasn't it that Equitable responded to these notices and court orders that were sent to it? There was no need for Equitable to respond to those court orders. Shortly after receiving both court orders, freezing Mr. Schwartz's assets, and again, nothing in the cover letter said, by the way, we're asserting a Slayers Act claim under this novel theory. Please, you, Equitable, don't do anything. They were sort of just orders freezing all of his assets. They were both vacated within months of getting them, and the vacated orders were provided to Equitable. So it was in a position where it received an order that was an ex parte order that clearly said it was good only until further order of the court, and set forth a time for a hearing. There was a hearing, and the order was vacated. Notice cannot be indefinite. If you choose to give notice in that form by that type of an order, once that order is vacated, the notice is no longer there. And clearly the estate must have thought that because it gave notice twice. After the first one was vacated, it got it again. If it had kept on giving notice, then Equitable wouldn't have paid the money out, is that it? Well, I think one of the interesting things is obviously because it was such a novel claim, Equitable would have had no reason or basis to ever understand that the Slayer's Act claim would apply to property held solely in the Slayer's name, to which the wife, under normal circumstances, had no entitlement to. There was nothing that was ever said to Equitable to point that out, other than just here's orders freezing all of his assets. They're now vacated. Now you have a demand for payment of a portion of the fund, and no contractual basis to deny that payment. The payment was made. I mean, one of the things that the annuity holder must do is honor the terms of the contract it had. And that's what it attempted to do in making the payment. In trying to find – this is what, New Jersey law here? Yes. In trying to find a case that was going to be helpful in analyzing this issue, the only thing we could find was going all the way back to 1901, believe it or not, French v. Higgins, and the New Jersey Supreme Court held that the statute of limitations on an action to recover for failure to pay an assessment on notes did not accrue when the assessment was made, but rather accrued once the notice rendered the assessment payable. Doesn't that suggest that a New Jersey court would not hold that the claims in this case accrued until the estate actually had a right to the payment of funds from the retirement plan? Well, they had a right to the – the Wasserman court said they had a right to the payment of the funds as of the date of her death. So clearly they knew they had that right. They put everyone on notice. But in effect, you've got to have the ability to go give that notice. They had no ability to go give that notice until Wasserman came out, did they? Well, that's incorrect. Had they pursued Equitable directly, they would have gotten an opinion presumably in that court on the same findings of fact. Maybe they should have, and also maybe Equitable should have responded to them when the notices were sent in 1997 and 1999 instead of just go radio silent. Like I said, when Equitable received the notices, it then very promptly received orders vacating those same notices. And also the record is entirely unclear as to whether there were or were not any communications between Equitable and any of the attorneys representing the estate or Dr. Schwartz. This motion was made on a motion to dismiss, and so there hasn't been any development of that record. And there very well may be communications back and forth discussing what should be taking place. Well, if Equitable was asserting a newer, should have known standard relative to the tolling of the statute of limitations or the statute of limitations bar, why shouldn't Equitable permit this case to go beyond the motion to dismiss stage? So there is discovery. Why should this case be decided at the motion to dismiss stage? It seems that there are issues here that we don't have enough factual basis for. Well, I think because the main issue, which is what the estate knew and when it knew, is set forth in black and white in the Washington's opinion. They hired a forensic accountant. The forensic accountant went out, valued all the assets, determined how much had been dissipated, and if she didn't know an actual fact of the distribution to Dr. Schwartz from Equitable, she should have, by any exercise of reasonable due diligence, as that's what she was engaged to do. And she prepared a report. She testified at a trial. And so we don't need any more discovery to know what the estate knew or should have known as of that date. And that would be the response. Well, except for the fact that there may or may not have been letters or phone calls made by the Equitable, and we don't know what that representative of Equitable may have said or may have written to tell those representatives of the estate that we are or aren't going to pay if we don't know that. We don't know if they relied on the language of the annuity contractor. Well, presumably, in making the payment to Dr. Schwartz, Dr. Schwartz was the one who demanded the payment. Dr. Schwartz was the one who demanded the payment. Actually, the way the camera is set up, you look at Judge Fisher by looking at us. Oh, I'm sorry. Not by looking at the screen over there. I mean, somehow you think there's a connection, but it's... Sorry about that. Oh, that's all right. Go ahead. Isn't it also the case in reference to this claim that it did not actually, if you will, arise until this forensic accounting took place and the judge looked at it and it was determined then and there that Schwartz had the money? How do we know that the estate knew that Schwartz had this $93,000 until the time of his trial? If I may, my time is up. No problem. The estate obviously knew because it put equitable on notice years before. So it had knowledge of the annuity and the retirement funds. It put equitable on notice. And then it hired a forensic accountant. And that, if it didn't know before, when its forensic accountant went out, got the report, did the valuations, at that point it knew or should have known. And those dates were more than six years before it filed suit. But back at that time, no payment had been made when those notices went out, and it wasn't until the accounting that the estate allegedly first learned that $93,000 had indeed been paid out. That's the way I read it back. Correct me if I'm wrong. It wasn't until the first state of trial. At the very latest, presumably it would have had to have been at some point prior, but at the very latest when the expert testified at trial as to the disbursements, the estate knew that the money had been disbursed to Dr. Schwartz. Whether it knew before or not, we don't know. But we do know at least as of that date, and that date puts their claim beyond the statute of limitations. Any further questions? Judge Fischer? Not for me. Judge Manfred, thank you. Judge Roth? Thank you very much. Judge Mignone? Thank you. I wanted to stress that whatever the expert testified to at the trial, whatever the expert found in her report, whatever requests the expert made of the trial judge are overridden for our purposes by what the trial judge did. The trial judge could have looked at all of the information from the expert and said, I'm going to find there won't be equitable distribution. I'm going to find that there will be, and here's the amount. And I think that's the heart. Until those rights were fixed by the state court judge and the amount that the deceased spouse's estate was entitled to,  Or the same with the judge in Wasserman until that judge looked at it and said, all right, under the New Jersey Slayers Act, I am going to hold that this is a right I will recognize. It's a case waiting for a judge to look at it. And this case could have been the case where the judge said, yes, the New Jersey Slayers Act will recognize this right, this right which exists from the time of the slaying. It's possible. And likewise, Your Honor, the trial judge may have found, you know what, for whatever reason, I'm not going to find that the estate was slayed. It could have, and then you would have appealed it to the New Jersey Supreme Court. We could have had appeals. It could have gone back and forth. Look at the discovery rule in a malpractice case. And New Jersey recognizes the discovery rule, and it has held that if you have a claim for medical malpractice, like a sponge in your abdomen, and you don't discover it for five years, then the statute of limitations begins to run from the time of discovery. Yes. Okay. So Mr. A has a sponge in his stomach, and he brings, it's never been decided before, he brings suit, and the New Jersey court says, fine, we are creating the discovery rule. Mr. Brown had a sponge left in his abdomen a year before Mr. Smith did, or even a year after Mr. Smith did, and he doesn't, he discovers it about the same time. He doesn't, I've got the analogy, I'm having trouble expressing it. Mr. Brown has a, Mr. Smith had the sponge left in his abdomen. He brought suit, and New Jersey for the first time recognized the discovery rule, and said, yes, you have two years from the time that the sponge was discovered to bring your cause of action. Mr. Brown had had a sponge left in his abdomen the year before. But doesn't, he discovers it, once he hears about the, yes. He discovers it six months later. Yes. He hears about Mr. Smith's suit, and he brings suit three years after Mr. Brown discovers the sponge, but only one year after Mr. Smith had the discovery rule recognized. And the New Jersey court is going to say Mr. Brown's right of action accrued at the time that he discovered the sponge, not at the time he discovered the discovery rule. That may be. Certainly there are. And I think this is an analogous situation. The discovery rule is an equitable one. Yes. So it's meant to, you know, the judge has to weigh all the equities. But Mr. Brown's cause of action did not accrue at the time Mr. Smith's case created the discovery rule. Mr. Brown's cause of action accrued two years, at the time he discovered the sponge in his abdomen. Sure. And in this case, Your Honor, certainly there have to be damages. And in this case, the cause of action accrued at the time of the Slayers Act, not at the time that the Wasserman case confirmed that this was a cause of action. And I would respectfully note, Your Honor, that until the Wasserman opinion, the estate did not know if it had a claim. All right. The same as Mr. Brown didn't know that the discovery rule would be recognized by the New Jersey courts until Mr. Smith's case. But that didn't mean that Mr. Brown couldn't have brought his own case and had it discovered, created in his case as opposed to Mr. Smith's case. But the difference is that in Your Honor's analogy, in Your Honor's hypothetical, the damage occurred. In our situation, the damage didn't occur until the trial court and Wasserman found that we had a right. No. The damage occurred at the time of the Slayers Act, and the recognition of the cause of action validating the right occurred in the Wasserman case. Well, to go back to the point we were discussing before, it's red. May I continue? Yeah. Go right ahead. What if the trial court and Wasserman had ruled against the estate, as we were discussing before? Appeals occurred. Proceedings occurred. But what if that consumed six years? Would that mean that because the appellate process took six years, we have no right of action? Unless you had pursued it yourself. Yeah. What if six years later the trial judge said, okay, I'm finally going to recognize that this estate has a claim to these equitable proceeds? Under the rationale used by the trial judge here, we'd be precluded. Right. You should have pursued it yourself. And as Counsel Freckle has conceded, Roberta Schwartz, the murdered spouse, had no rights to the equitable account until that ruling. She had signed a waiver. She had a right to try to get it. She had signed a waiver to the account. Well, that's another issue. She had no rights to the account. No rights to the account until September of 2001. She had signed a waiver. If she's making it under the Slayers Act, she had a right arising as of the time of the slaying. Assume that's right, that you still have tolling until a certain period of time. What this case really comes down to is, does tolling exist from the time, if a cause of action occurred prior to September of 2001, did tolling exist until July of 2001 or did tolling exist until September of 2001? And it really comes down to whether, if in July of 2001, you actually had a right to have to have finding out that there were assets you might go against, or did the right come into being in September of 2001 when the Wasserman decision came down? I think that's right. And certainly our fundamental position is that right did not begin to accrue until September of 2001. Our backup argument is discover rule equitable tolling, et cetera. But our fundamental argument is, until you have a right to the account, the claim can't start to accrue. It's as simple as that. And there's absolutely no dispute that the deceased spouse, the killed spouse, had no rights in the account. She had a right to try to make a claim, and the Wasserman case did make a claim. We all have rights to make claims. The question is whether we have a basis for the claim. I think we're going around in circles. We got the argument. It was well argued on both sides. We thank counsel for doing such a good job. We'll take the matter under advisement.